## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SHIRLEY STEPHENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-20-00306-JD |
| | ) | |
| BMAG MANAGEMENT COMPANY, | ) | |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is a Motion for Summary Judgment ("Motion") filed by

Defendant BMAG Management Company, LLC ("BMAG") [Doc. No. 53].[1] Plaintiff

Shirley Stephens ("Ms. Stephens") filed a response in opposition [Doc. No. 63], and

BMAG filed a reply [Doc. No. 67]. The matter is fully briefed and at issue.

## I.    BACKGROUND

Ms. Stephens, "a female of African American descent" and former employee of

BMAG, filed this lawsuit in Oklahoma County District Court following the termination

of her employment as a controller for BMAG. [Doc. No. 1-1 at ¶ 8]. BMAG removed the

action to federal court based on federal question subject matter jurisdiction. Ms. Stephens

originally asserted claims for race and gender discrimination as a result of her termination

and retaliatory discharge under 42 U.S.C. §§ 1981 and 1983, Title VII, and the Oklahoma

Anti-Discrimination Act. BMAG moved to dismiss Ms. Stephens' claims under § 1983,

---

[1] Also of record is Exhibit No. 4 to BMAG's Motion [Doc. No. 54], which is filed
under seal. The Court uses ECF page numbering in this Order.

asserting it was a private employer and not acting under color of state law when it terminated Ms. Stephens. Ms. Stephens did not object to dismissal of those claims, and the Court dismissed Ms. Stephens' claims under 42 U.S.C. § 1983. [Doc. No. 15].

BMAG now asserts that it is entitled to summary judgment on Ms. Stephens' remaining claims. Although a failure to promote claim is not apparent on the face of the governing petition [*see* Doc. No. 1-1], BMAG also seeks summary judgment on a failure to promote claim.

Ms. Stephens' termination followed her second round of employment with BMAG, which is a motor vehicle dealer. Ms. Stephens asserts that she was terminated because of her race and gender and in retaliation for reporting transactions by other employees outside normal company standards. BMAG asserts that Ms. Stephens was terminated after an internal investigation revealed she had violated company policy in relation to her attempted purchase of three vehicles from BMAG.

## II.   <u>STANDARD OF DECISION</u>

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is material 'if under the substantive law it is essential to the proper disposition of the claim.'" *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013)). A dispute about a material fact is genuine if a rational trier of fact could find in favor of the nonmoving party on the evidence presented. *Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 882 (10th Cir. 2018). In applying this standard, the Court

2

"view[s] the evidence and draw[s] all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (citation omitted).

A.   **Ms. Stephens' response brief does not comply with Local Civil Rule 56.1.**

BMAG is correct that Ms. Stephens' response brief does not comply with the Local Civil Rules. In violation of Local Civil Rule 56.1, the response brief does not respond "*by correspondingly numbered paragraph*, to the facts that [BMAG] contends are not in dispute." LCvR56.1(c) (emphasis in original). Compliance with this rule is essential to the meaningful consideration of whether there are genuine issues of material fact precluding summary judgment.

Under Local Civil Rule 56.1(e), "[a]ll material facts set forth in the statement of material facts of the movant may be deemed admitted for the purpose of summary judgment unless specifically controverted by the nonmovant using the procedures set forth in this rule." "As such, [Ms. Stephens'] failure to properly respond would permit the Court to find [BMAG's] statement of facts, as supported by the evidence, undisputed." *See Lancaster v. Sprint/United Mgmt. Co*., Case No. CIV-13-1348-R, 2016 WL 379785, at *1 (W.D. Okla. Jan. 29, 2016); *see also Glossip v. Chandler*, Case No. CIV-14-0665-F, 2021 WL 1240695, at *1–2 (W.D. Okla. Apr. 2, 2021); *Scalia v. Ghosn*, 451 F. Supp. 3d 1215, 1220 (W.D. Okla. 2020).

The Tenth Circuit has upheld this approach, observing that it is not the district court's responsibility "to conduct a fishing expedition" to compensate for a deficient response. *See Coleman v. Blue Cross Blue Shield of Kan., Inc.*, 287 F. App'x 631, 635

3

(10th Cir. 2008) (unpublished) (addressing a similar local rule); *see also Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (explaining it is the responding party's burden to ensure that the factual dispute is shown with particularity, without relying on the trial court to conduct its own search of the record).

Nevertheless, the Court has an independent duty to determine whether summary judgment is appropriate under Federal Rule of Civil Procedure 56(e)(3), even if a party fails to properly address another party's assertion of facts as required by Rule 56(c). *See Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002); *Murray v. City of Tahlequah, Okla.*, 312 F.3d 1196, 1200 (10th Cir. 2002). Thus, the Court has conducted its independent review of the evidence of record under Rule 56(c) and reviewed Ms. Stephens' response brief to determine whether any part of the brief controverts, with evidence, any of BMAG's material facts.

**B.    Most of the information in Ms. Stephens' declaration on which she relies to try to create an issue of fact is inadmissible.**

BMAG asserts that Ms. Stephens' "conclusory, unsupported Declaration [Doc. No. 63-1] does not create an issue of fact." [Doc. No. 67 at 3]. A party opposing summary judgment "need not produce evidence 'in a form that would be admissible at trial.'" *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995) (emphasis omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "[H]owever, the content or the substance of the evidence must be admissible." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005).

4

The requirement that the substance of the evidence must be admissible is not only explicit in Federal Rule of Civil Procedure 56(c)(4), but it is also implicit in the Court's role at the summary judgment stage. *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006). Rule 56(c)(4) provides that an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In determining whether genuine issues of material fact make a jury trial necessary, a court may consider only the evidence that would be available to the jury. *Argo*, 452 F.3d at 1199; *see also Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1216 (10th Cir. 2004) (holding that the district court did not err in granting the defendant's motion for summary judgment and recognizing that "[j]ury verdicts may not be based on speculation or inadmissible evidence or be contrary to uncontested admissible evidence"). Conclusory and self-serving affidavits or declarations are not sufficient to survive summary judgment. *See Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995).

The Court agrees with BMAG that most of the information in Ms. Stephens' declaration, on which she relies to try to create an issue of fact, is inadmissible and not effective for summary judgment purposes. Additionally, Ms. Stephens, in her response brief, states facts without any citation to supporting evidence or with citations that do not support the factual statements. Further, much of Ms. Stephens' declaration, as BMAG points out, is "comprised of . . . generalized statements about unnamed people at unidentified times purportedly violating unspecified policies, procedures, and laws."

5

[Doc. No. 67 at 3–4]. *See Matthiesen v. Banc One Mortg. Corp.*, 173 F.3d 1242, 1247 (10th Cir. 1999) (explaining that unsupported conclusory allegations are not sufficient to defeat summary judgment).

III.   **STATEMENT OF UNDISPUTED MATERIAL FACTS**[2]

Ms. Stephens first came to work for BMAG as a controller in August 2008. She was hired by, and reported to, Shannon Hutton, director of accounting. Ms. Stephens and Ms. Hutton knew each other from prior employment at a different dealership. Ms. Stephens continued working at BMAG, and for Ms. Hutton, until her voluntary resignation in June 2014. At the time of her voluntary resignation in 2014, Ms. Stephens was the highest paid controller at BMAG. Ms. Stephens admits that Ms. Hutton asked her to stay, but Ms. Stephens left in 2014 to pursue another job opportunity.

In 2016, Ms. Hutton reached out to Ms. Stephens to see if she would be interested in returning to work at BMAG. During the negotiations, Ms. Hutton told Ms. Stephens, "I would love you to join the team again." [Doc. No. 53-7]. Ms. Hutton also told Ms. Stephens that she really wanted to "make this work," and that Ms. Stephens would "fill a crucial part of what we need done." [Doc. No. 53-8]. Additionally, Ms. Hutton stated she would "go to bat on the salary." *Id.*

---

[2] This statement includes material facts presented by both parties that are supported as required by Fed. R. Civ. P. 56(c)(1). If a party has asserted a fact, or asserted that a fact is disputed, but has failed to provide necessary support, the assertion is disregarded. All facts are stated in the light most favorable to the nonmovant, Ms. Stephens.

Ms. Stephens was hired back by Ms. Hutton at a $140,000.00 annual salary on May 6, 2016. Ms. Stephens was also eligible for, and received, a $20,000.00 bonus that same year. Per Ms. Stephens' offer letter, she was to receive a $30,800.00 bonus for 2017. Instead, she was paid more, and when Ms. Stephens asked Ms. Hutton about it, she told her to keep it because she deserved it.

When Ms. Stephens was rehired in 2016, Ms. Stephens worked with three other controllers at BMAG. All of them were Caucasian and all were paid less than Ms. Stephens. Ms. Stephens continued to be the highest paid controller throughout the remainder of her employment.

Ms. Stephens has more than 30 years of experience in the car industry. She testified in her deposition that during her tenure as controller at BMAG, no one had more experience with accounting departments for car dealerships than she did. Ms. Stephens also indicated in her deposition testimony that she was responsible for training 24 to 40 people in the accounting department at BMAG because she was the most experienced and knowledgeable. Ms. Stephens admits that three key areas of a controller's responsibility are profitability, internal controls, and asset management.

Ms. Stephens agreed that having signed contracts and keeping the car title in the file until payment is received are safety measures that the accounting department is responsible for handling.

In 2017, Ms. Stephens purchased a Land Rover from BMAG. She signed the required documents and titled the vehicle in her name on February 24, 2017. She agreed

this was a "clean car deal," and that she was not disciplined for this transaction. [Doc. No. 53-1 at 22 (101:13–25)].

On August 20, 2018, an accounting clerk ran her routine monthly report for accounts reaching a 60-day aging status. Ms. Stephens' name was on the 60-day bad debt report. The accounting clerk reported it to her immediate supervisor, Melody Wedman, who then reported it to Ms. Hutton. Upon an initial review of the records, it appeared Ms. Stephens had three car deals in her name for June, July, and August 2018—a 2007 Acura, a 2011 BMW, and a 2015 Maserati. Seeing some concerns, Ms. Hutton reported it to Barbara West, director of risk, who began an investigation. Fifteen employees were interviewed, and a written report was completed by Ms. West.

**A.    The undisputed material facts show irregularities with the 2007 Acura purchase.**

On June 30, 2018, Ms. Stephens signed a Retail Purchase Agreement with BMAG for a 2007 Acura. Only Ms. Stephens' name was listed on the signed Agreement as a purchaser of the vehicle. The car was to be paid for in cash by Ms. Stephens in the amount of $5,028.00. Included in the file was a second Retail Purchase Agreement also dated June 30, 2018, for the same 2007 Acura. This Agreement listed Ms. Stephens and Erdoo Segher, a family friend, as purchasers. It was not signed.

Although BMAG asserts that no payment was ever made for the 2007 Acura, it appears that BMAG deposited a check from Ms. Stephens on August 22, 2018—the same day Ms. Stephens was terminated—for $5,028.00. The check was dated July 30, 2018. Ms. Stephens admits in her response brief that she took possession of the Acura on July

12, 2018, which predates the date written on the check and predates BMAG's deposit of the check. [Doc. No. 63 at 11].

From the Court's independent review of the evidence, the Court was able to discern that Ms. Stephens obtained a hold check form from BMAG that allowed her to defer payment for the Acura until July 30, 2018, and that Ms. Hutton admittedly approved an exception for Ms. Stephens to defer payment until after her paycheck sometime in July 2018. Ms. Hutton testified in her deposition that after Ms. Stephens' termination, Ms. Stephens told BMAG there was a check for the Acura in her cabinet behind her desk, and Ms. Stephens told BMAG to cash it.

The title to the Acura was not in the file per normal process because Ms. Stephens took it out of the accounting office and gave it to Ms. Segher. Ms. Segher, in turn, went to a tag agency and titled the car in her name and Ms. Stephens' name on August 6, 2018. The Certificate of Title shows assignment of title to Ms. Stephens, as the purchaser, on July 5, 2018. It shows a reassignment of title to Ms. Stephens and Ms. Segher on August 6, 2018.

The Oklahoma Tax Commission issued title to the 2007 Acura to Ms. Stephens and Ms. Segher on August 18, 2018. Ms. Stephens admitted at her deposition that on that date BMAG had no signed paperwork from Ms. Segher, and no money from either Ms. Stephens or Ms. Segher for the 2007 Acura. Thus, it is undisputed that Ms. Stephens represented to the State of Oklahoma that she owned the 2007 Acura despite not having paid for it at that time. Further, Ms. Stephens admitted in her deposition that BMAG would have no recourse against Ms. Segher, absent her signed signature on the Retail

Purchase Agreement, had BMAG not been able to obtain the money from Ms. Stephens for the Acura.

**B.      The undisputed material facts show irregularities with Ms. Stephens' attempted purchase of the 2011 BMW X6.**

During the investigation, BMAG discovered that Ms. Stephens had also obtained possession of a red 2011 BMW X6. The original Retail Purchase Agreement for the BMW was dated July 31, 2018, but was not signed. The purchase price reflected on the Agreement was $22,000.00 plus some additional fees and was to be fully financed through Ally Financial. Ms. Stephens later signed a new Retail Purchase Agreement on August 18, 2018, for the same BMW. Ms. Stephens admitted that she was going to give the BMW to her son.

She also admitted that she could have purchased the BMW for $17,000.00, but she worked out an agreement with Tim Ososanya, the finance director, and Gary Kruszynski, the sales manager, to increase the purchase price to $22,000.00, so that she could get $5,000.00 cash back.

BMAG has a cash back policy that prohibits cash back for customers unless it is for tag, title, and license fees or for equity in a trade-in vehicle. Even if it meets one of these two permissible reasons, the cash back cannot be issued to the customer until all paperwork has been completed. Although Ms. Stephens was the most experienced controller at BMAG and responsible for training the accounting department on policies and procedures, she stated in her deposition that she was unaware of the cash-back policy. Having now reviewed the policy, she admits that the $5,000.00 cash-back check

to her violated the policy since it was not for tag, title, and license fees and there was no trade-in. The Court would note that Ms. Stephens' claim that she was unaware of BMAG's cash-back policy is disputed by her own evidence. *See* [Doc. No. 63-22], which is a July 5, 2017 email to Ms. Stephens and other controllers from Ms. Hutton reminding them of the cash-back policy.

Ms. Stephens admits that she did not have Ms. Hutton's permission to receive the $5,000.00 cash back. Ms. Stephens acknowledged in her deposition that not all lenders allow cash back to customers. She is unaware of whether Ally Financial allows it or not. However, Ms. Stephens agreed that none of the lending documents would have given Ally Financial notice that it was financing a $17,000.00 car with $5,000.00 cash back to Ms. Stephens.

**C.     The undisputed material facts show irregularities with Ms. Stephens' attempted purchase of the 2015 Maserati.**

BMAG's investigation also revealed that Ms. Stephens started another car deal on the same date as the BMW—July 31, 2018—for a 2015 Maserati. The Retail Purchase Agreement, which was not signed by Ms. Stephens, lists her as the purchaser and a required down payment of $7,300.00. Ms. Stephens stated she took possession of the Maserati on August 7, 2018.

On August 8, 2018, Ms. Stephens directed a subordinate to issue her a warranty refund check for her Land Rover, which she traded in as part of the Maserati transaction. Although Ms. Stephens disputes whether it was proper for the refund check to be issued to her directly—rather than the lender on the Land Rover—Ms. Stephens admits, and

email correspondence corroborates, that she directed a subordinate employee to issue her funds before giving BMAG any of her down payment and before the Maserati deal was complete. Indeed, at the time Ms. Stephens directed her subordinate to issue her a check directly, no down payment had been given to BMAG, and there was no signed contract in the file.

During the investigation, another subordinate employee stated that Ms. Stephens directed her to quickly issue a check to Tinker Federal Credit Union in the amount of $66,000.00 for the trade-in on Ms. Stephens' Land Rover. Ms. Stephens denies the accuracy of this statement. In any event, a check was cut and sent to Tinker Federal Credit Union on August 15, 2018, by BMAG despite no signed contract for the Maserati or a down payment on same. The Court notes from its review of the unsigned Retail Purchase Agreement for the Maserati, which included the Land Rover trade-in as part of the same transaction, that Ms. Stephens still owed $66,000.00 on the Land Rover.

**D.    The undisputed material facts show that BMAG had zero funds for the three vehicles on the date of Ms. Stephens' termination and that two other employees, a Caucasian male and African American male, were also terminated because of their involvement with Ms. Stephens' car deals.**

BMAG's investigation disclosed that Ms. Stephens directed subordinates to assist her in violating company policy. Ms. Stephens was terminated on August 22, 2018. When the termination was communicated to Ms. Stephens, she indicated for the first time that there was a check for the Acura in her office. Ms. Stephens gave permission for BMAG to cash the check. BMAG ordered Ms. Stephens to return the BMW and Maserati, and BMAG returned the trade-in vehicle (the Land Rover) to Ms. Stephens.

12

After Ms. Stephens' termination, another check in the amount of $7,300.00 for the down payment on the Maserati was discovered in her office. It was post-dated August 30, 2018. As the car had already been returned, the check was never cashed. No one at BMAG knew about the second check until after Ms. Stephens' termination.

Mr. Ososanya and Mr. Kruszynski, both of whom were involved in Ms. Stephens' deals on the BMW and Maserati, were also terminated from BMAG. Mr. Kruszynski is a Caucasian male. Mr. Ososanya is an African American male.

Ms. Stephens admits that her paperwork was sloppy, that she made mistakes, and that BMAG had zero funds for any of the three vehicles on the date of her termination.

**E.    The undisputed material facts show that none of Ms. Stephens' identified comparator employees is similarly situated, nor is there evidence of record that BMAG's employment decisions concerning these individuals was based on their race or gender.**

The only person who Ms. Stephens claims discriminated against her based on race or gender is Ms. Hutton. However, Ms. Stephens admits that Ms. Hutton never made any racial comments to her or about anyone else in her presence, nor did Ms. Hutton make any negative comments to Ms. Stephens about her gender.

Ms. Stephens is unaware of any other employee who has ever titled a car in their name without having paid for it. Moreover, Ms. Stephens is unaware of any other employee who has taken possession of a car and given it to someone else before making any of the required payment. Nor is Ms. Stephens aware of any other employee at BMAG who has been listed on the bad debt report.

Ms. Stephens indicated in her deposition that she believed some employees received cash back for reasons other than equity in a trade-in or tag, title, and license fees. However, she conceded she did not know the reasons for the cash back for these car deals, nor does she have any evidence that Ms. Hutton knew about or approved them. The accounting clerk in charge of cash-back checks testified that the reason cash back is limited to those two circumstances is because BMAG is not a lender or a bank, and it does not "just lend out money to customers." [Doc. No. 53-27 at 2 (20:13–22)]. Additionally, Ms. Hutton testified that the cash-back policy was narrowed down to those two reasons because "cash back needs to be disclosed to any financing lender," and that some lenders allow cash back and some do not. [Doc. No. 63-25 at 1 (123:1–11)]. Although it is the responsibility of the accounting department to review any "cash back related to a car deal," Ms. Hutton admitted that "sometimes things slip through the cracks." *See id.* (123:12–23).

From the Court's independent review of the evidence of record, it appears that four other BMAG employees received cash back for car deals—Zac Sanders, Moses Reyna, Kari Fieszel, and George Miller. [Doc. Nos. 63-29 & 63-30]. There is no evidence of record that indicates for what reasons these four employees received cash back. Ms. Stephens asserts, without citing to any evidence, that Sanders and Miller are Caucasian males. Ms. Fieszel is female, and Mr. Reyna is a Hispanic male. *See* [Doc. No. 67-2]. Ms. Hutton testified that Fieszel, Reyna, and Sanders were not accounting employees and did not report to her, and that she had no knowledge of the three receiving cash back. *See* [Doc. No. 67-1 at 4–5 (124:8–125:5)].

14

In Ms. Stephens' declaration and her deposition testimony, she generally and conclusory refers to other BMAG employees (predominately Caucasian males who are general managers ("GM")) who she asserts violated the same or similar policies and processes that she violated, but who were not terminated by BMAG. *See generally* [Doc. No. 53-2 at 14–45 (308–339) & Doc. No. 63-1]. She does not identify any of these individuals by name in her declaration, but she was asked about specific individuals in her deposition. The alleged violations range from one GM not signing his pay plan on time to issues with deferred income, a failed audit, and removal of marketing items without permission.

However, none of the alleged comparators, aside from Ms. Wedman, were controllers or worked in accounting. Additionally, none were investigated for the same or similar violations as Ms. Stephens, or as many violations as Ms. Stephens. Further, Ms. Stephens admits that she has no evidence, other than her own subjective belief, that any difference in discipline was based on race or gender.

### 1)      *Melody Wedman*

Ms. Stephens asserts that she was treated differently than Ms. Wedman, a Caucasian female controller, who purportedly took BMAG marketing items without permission from a bucket by the door on her way out, and then returned them the next day after being asked about taking them. Ms. Stephens does not know whether Ms. Wedman received any discipline over this incident. Ms. Stephens admits that she has no evidence, other than her own speculation, that Ms. Wedman was treated differently by BMAG based on her race.

Additionally, Ms. Stephens asserts that Ms. Wedman had one location that failed a sales tax audit, but she was not terminated as a result. However, Ms. Stephens admits that she too has managed a location that failed a sales tax audit, although not to the same extent, but she was not terminated or reprimanded either for that issue.

### 2) *Casey Deskin and Angela Mirkhani*

Two current BMAG employees, both Caucasian females, split up Ms. Stephens' job duties after her termination in August 2018. Ms. Stephens admits that she has no specific information, other than her mere speculation, that this move to have Ms. Deskin and Ms. Mirkhani cover her former job duties was motivated or based on their race.

### 3) *Jeremy Freeman*

Ms. Stephens asserts that Mr. Freeman, a Caucasian male, and GM, delayed signing his pay plan in violation of company policy, and that Ms. Hutton was the person who told Ms. Stephens about Mr. Freeman's alleged violation. However, Ms. Stephens admits that the fact that Mr. Freeman was allowed to delay signing his pay plan "had nothing to do with his [race]" or gender, but because "[h]e was favored." [Doc. No. 53-2 at 15 (309:2–24)].

Additionally, Ms. Stephens asserts that Mr. Freeman was allowed to "control his gross profits each month" by breaking up the profits received from a car sale transaction and deferring his income into the next month, in violation of company policy. [Doc. No. 53-2 at 19 (313:15–20)]. She agreed this was not the same violation of company policy for which she was investigated. *Id*. at 20 (314:11–15).

16

Ms. Stephens indicated that she and Ms. Hutton talked about Mr. Freeman deferring income, and that Ms. Hutton directed Ms. Stephens to talk to Mr. Freeman about it. She advised that she confronted Mr. Freeman, but "he just kept doing it." *See id.* at 21 (315:1–7). Ms. Stephens, however, is unaware of whether Mr. Freeman was disciplined for doing so. *Id.* (315:12–14).

Ms. Stephens also asserts that Mr. Freeman requested a title on a car, and he purchased it earlier than he should have been allowed to because the car was on a stop sale list. However, Ms. Stephens admits that Mr. Freeman obtained the title with the permission of accounting management, and that he paid for the vehicle.

Ms. Stephens further contends that Caucasian male GMs at BMAG had a pattern of deferring income and were sloppy about getting all the paperwork needed for car deals, such as trade-in titles. She clarified this was not for their own car deals. She is unaware of whether any of these individuals were disciplined over these issues, but she contends that Ms. Hutton was aware. Ms. Stephens admits that she has no specific information that these GMs were allowed to do so on account of their race or gender.

### 4)   *Brendon Landgren*

Ms. Stephens asserts that Mr. Landgren also deferred income in violation of company policy, and that he was demoted after an investigation. She admits that she has no specific information that Mr. Landgren was allowed to defer income based on his race or gender, and she agrees this was not the same policy for which she was investigated.

5)    *John Crosby and Yan Brown*

Additionally, Ms. Stephens asserts that Mr. Crosby and Mr. Brown deferred income. She is unaware of whether they were disciplined for doing so, and she has no specific information that they were allowed to defer income based on their race or gender. Ms. Stephens confirmed in her deposition that none of the above people, aside from Ms. Wedman, worked in the accounting department. [Doc. No. 53-2 at 37 (331:22–25)].

6)    *Jimmy Krase and Ricky Bradford*

According to Ms. Stephens, Mr. Krase, a Caucasian male GM, reported four vehicles as sold that were not sold to meet a sales objective in October 2017. She advised that Ms. Hutton approved him doing so, although she does not know why. Ms. Stephens asserts that Ricky Bradford, an African American male GM, did the same thing in 2016 and was terminated as a result. Ms. Stephens' sole knowledge of Mr. Bradford's actions stems from information she received from Ms. Wedman.

7)    *Cory Rucker and Scott Tang*

Ms. Stephens asserts that Cory Rucker, a Caucasian male GM at Porsche, and Scott Tang, an Asian male finance director, exercised bad judgment, which resulted in a BMAG vehicle being stolen. She contends that Mr. Tang was terminated as a result, but Mr. Rucker was not. Ms. Stephens is unaware of whether Mr. Rucker was disciplined over the issue. She also does not know who specifically made the decision to terminate Mr. Tang, nor does she have any information that he was terminated based on his race or gender.

**F.      The undisputed material facts indicate that Ms. Stephens has abandoned her failure to promote claim.**

Ms. Stephens asserts in her declaration and deposition testimony that Caucasian employees received promotions and she did not. Specifically, Ms. Stephens stated in her deposition that there was a position open for which she was qualified during her first term of employment with BMAG in 2013. Although Ms. Stephens contends that she was more qualified than the Caucasian female who received the promotion, she admits that she has no specific information, other than her own speculation, that the employment decision was based on race. Further, Ms. Stephens made no complaint, either internally or externally, concerning the lack of promotion prior to filing this lawsuit in 2019.

Moreover, Ms. Stephens admits that the only possible position that came open and to which she could have been promoted during her second term of employment with BMAG was one in which she admits race and gender played no role in the decision. This was the finance director position, and Ms. Mirkhani, a Caucasian female, was promoted to that position. Ms. Stephens admits, however, that Ms. Mirkhani was qualified for the position.

Finally, Ms. Stephens admits that Ms. Hutton was grooming her for a promotion in mid-2018, and BMAG was even paying to send Ms. Stephens to leadership courses. However, the position simply never materialized before Ms. Stephens' termination in August 2018.

**G.   The undisputed material facts do not establish a prima facie case of retaliation because Ms. Stephens admittedly never reported her concerns of discrimination to BMAG.**

Ms. Stephens never made a complaint of race or gender discrimination during her employment with BMAG. Instead, she claims to have had "general conversations" with Ms. Hutton about male GMs "violat[ing] policies and not being held accountable" and how people in "accounting . . . would be treated differently" than the GMs. [Doc. No. 53-2 at 46 (341:4–23)]. Ms. Stephens testified she had these conversations with Ms. Hutton "all the time," but she did not recall the specific dates of those conversations or have any notes or documents to show she complained about gender discrimination. *See id*. at 46–48 (341:18–343:13).

Ms. Stephens admits that she never told anyone other than Ms. Hutton, and that she never reported it to Human Resources or called the anonymous complaint hotline.

**IV.   <u>ANALYSIS</u>**

**A.   BMAG is entitled to summary judgment on Ms. Stephens' racially discriminatory wrongful termination claims under 42 U.S.C. § 1981, Title VII, and under the Oklahoma Anti-Discrimination Act.**

Ms. Stephens asserts claims of race discrimination based on her alleged wrongful termination under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, and the Oklahoma Anti-Discrimination Act, Okla. Stat. tit. 25, § 1101 et seq. ("OADA"). Title VII prohibits an employer from discriminating against any individual "because of such individual's race." 42 U.S.C. § 2000e–2(a)(1). The OADA makes it "a discriminatory practice for an employer . . . to discharge, or otherwise to discriminate against an individual . . . because of race." Okla. Stat. tit. 25, § 1302(A)(1). "[A]bsent

direct evidence of discrimination, claims under all three laws are subject to the

*McDonnell Douglas* burden-shifting framework."[3] *Raymond v. Select Specialty Hosp. –*

*Tulsa/Midtown, LLC*, 375 F. Supp. 3d 1203, 1211 (N.D. Okla. 2019). Here, Ms. Stephens

relies on circumstantial evidence to show BMAG's discriminatory intent; thus, the Court

employs the three-step burden-shifting framework set forth in *McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792 (1973) to determine whether Ms. Stephens' race discrimination

claims under Title VII and the OADA survive summary judgment.

First, Ms. Stephens has the burden of presenting a prima facie case of race

discrimination. *See Throupe v. University of Denver*, 988 F.3d 1243, 1251 (10th Cir.

2021). If Ms. Stephens establishes her prima facie case, the burden of production then

shifts to BMAG to articulate a legitimate, non-discriminatory reason for its actions. *See*

*id.*; *see also Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir.

2015). If BMAG does so, the burden of production shifts again to Ms. Stephens to show

that BMAG's articulated reasons are pretextual. *See Bennett*, 792 F.3d at 1266.

---

[3] The parties do not analyze the racial discrimination claims under each separate Act, and it is not necessary to do so because in "'racial discrimination suits, the elements of a plaintiff's case are the same . . . whether that case is brought under §§ 1981 or 1983 or Title VII.'" *Baca v. Sklar*, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005) (quoting *Drake v. City of Ft. Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991)); *see Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 n.4 (10th Cir. 2000) (providing that racial-discrimination claims under § 1981 and Title VII have the same prima facie elements as provided by *McDonnell Douglas*) (citations omitted); *see also Mann v. XPO Logistics Freight, Inc.*, 819 F. App'x 585, 594 n.15 (10th Cir. 2020) (unpublished) ("[T]he [Supreme] Court did not displace *McDonnell Douglas*'s application to § 1981 claims.") (citing *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020)). Here, Ms. Stephens' § 1981 racial discrimination claim fails for the same reasons her Title VII claim fails. Thus, BMAG is entitled to summary judgment on Ms. Stephens' § 1981 claim for the same reasons.

1) **Step One—BMAG concedes that Ms. Stephens can establish a prima facie case of race discrimination.**

To set forth a prima facie case of discrimination for wrongful termination, Ms. Stephens generally must establish that (1) she is a member of a protected class; (2) she was qualified for her position; (3) she was discharged; and (4) her position was not eliminated after her discharge. *See Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1150 (10th Cir. 2008). The critical inquiry "is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *See id.* at 1151 (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)). BMAG agrees for purposes of the Motion that Ms. Stephens can establish a prima facie case of race discrimination. [Doc. No. 53 at 23]. It asserts, however, that Ms. Stephens' wrongful termination claim fails as a matter of law under Step Three of the burden-shifting analysis.

2) **Step Two—BMAG has presented a legitimate, non-discriminatory reason for Ms. Stephens' termination.**

BMAG contends, and the evidence reflects, that the proffered reasons for Ms. Stephens' termination are her improper car deals in violation of company policy. An employer's burden of articulating a justifiable, non-discriminatory reason for its employment action is "exceedingly light." *Montes v. Vail Clinic, Inc*., 497 F.3d 1160, 1173 (10th Cir. 2007). The employer's burden is one of production only.

Other courts have accepted that a legitimate, non-discriminatory reason for termination could be a violation of company policy. *See, e.g.*, *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1153 (10th Cir. 2008) (concluding that an employee's violation of the

company's policies and procedures regarding confidentiality by providing unredacted medical records to a third party was a legitimate, non-discriminatory reason for her termination); *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007) (concluding that the defendant had produced a legitimate, non-discriminatory reason for termination where the bank's policy made it clear that termination could result from a branch manager refunding overdraft fees on branch employees' accounts without approval); *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1166 (10th Cir. 2007) (explaining that an employer's explanation that an employee was terminated for her ethical violations of company policy satisfies the second step of *McDonnell Douglas*); *Raymond*, 375 F. Supp. 3d at 1213 (finding that the defendants had met their "exceedingly light" burden to proffer a legitimate, non-discriminatory reason where the defendants asserted the plaintiff was terminated in accordance with the employee handbook).

The Court concludes that the evidence cited by BMAG is more than sufficient to satisfy its burden of articulating a justifiable, non-discriminatory reason for Ms. Stephens' termination. The undisputed material facts show numerous irregularities with Ms. Stephens' purchase of the 2007 Acura and her attempted purchases of the 2011 BMW and 2015 Maserati. Additionally, the undisputed material facts show that Ms. Stephens violated several of BMAG's policies, including, but not limited to, violating the cash-back policy; taking possession of vehicles before paying for them; removing a car title from the file in the accounting office; not signing Retail Purchase Agreements; and directing a subordinate to issue a warranty check for a trade-in vehicle before a down

payment was made on the new vehicle. Ms. Stephens also falsely represented to the State of Oklahoma that she owned a vehicle that was not hers at the time.

### 3)   *Step Three—BMAG's decision to terminate Ms. Stephens' employment was not pretextual.*

The burden thus shifts to Ms. Stephens to show that the proffered reason is a mere pretext for discrimination; to avoid summary judgment at this stage, Ms. Stephens must present sufficient evidence to create a genuine factual dispute regarding pretext. *See Montes*, 497 F.3d at 1173. To do so, Ms. Stephens must present evidence showing that BMAG's reasons for termination are "'so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief.'" *Young v. Dillon Cos.*, 468 F.3d 1243, 1249 (10th Cir. 2006) (quoting *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004)).

A pretext challenge requires the Court "to look at the facts as they appear to the person making the decision to terminate [the] plaintiff." *Kendrick*, 220 F.3d at 1231. Moreover, the Court does not decide "whether the employer's reasons were wise, fair or correct; the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118–19 (10th Cir. 2007) (citing *Timmerman*, 483 F.3d at 1120). Pretext is commonly shown through evidence in one of three ways: (1) an employer's stated reason for the termination was false; (2) the employer acted contrary to a written company policy; or (3) the employer treated the plaintiff differently than other similarly situated employees who violated work rules of comparable seriousness. *See Kendrick*, 220 F.3d at 1230.

Ms. Stephens has not presented any evidence that would permit a reasonable fact finder to infer that BMAG's stated reasons for her termination were false. BMAG's stated reasons have been consistent from the beginning. Additionally, Ms. Stephens was hired and fired by the same person, Ms. Hutton, within a relatively short period of time, which serves as "a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) (internal quotation marks and citation omitted) (explaining that "same actor" evidence gives rise to an inference "that no discriminatory animus motivated the employer's actions").

Ms. Stephens' comparator evidence also is unavailing and does not establish pretext. To begin with, Mr. Ososanya and Mr. Kruszynski, both of whom were involved in Ms. Stephens' deals on the BMW and Maserati, were terminated from BMAG. Mr. Kruszynski is a Caucasian male, and Mr. Ososanya is an African American male. Moreover, Ms. Stephens has presented no evidence of any employee violating the same policies that she did, or policies of comparable seriousness, who were treated differently by BMAG. For example, Ms. Stephens has not presented any evidence of an employee who was knowingly allowed by Ms. Hutton, or anyone else for that matter, to take a car title out of accounting before the deal was finalized and title a car in their name without payment. Nor has Ms. Stephens presented evidence of any employee who was knowingly allowed by Ms. Hutton to inflate the purchase price of a vehicle to obtain cash back. Ms. Stephens has presented no evidence of any employee who was allowed by Ms. Hutton to misuse their position of authority within the company to direct subordinates to violate

company policy. Finally, Ms. Stephens presented no evidence of any other employee who had three cars in their possession without paying BMAG.

The closest Ms. Stephens comes to identifying similarly situated employees who violated work rules of comparable seriousness is Jeremy Freeman and the four employees who received cash back on their vehicle purchases—Zac Sanders, Moses Reyna, Kari Fieszel, and George Miller. "Individuals are considered 'similarly situated' when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable seriousness.'" *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 801 (10th Cir. 2007) (quoting *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006)).

There is no evidence satisfying these similarly situated standards or otherwise sufficient for a rational trier of fact to find in favor of Ms. Stephens. For instance, there is no evidence of record that indicates for what reasons these four employees received cash back or that Ms. Hutton knew about the cash back or approved of the cash back. An employer cannot be held accountable for failing to treat situations similarly when it is unaware of them. *See, e.g.*, *Doke v. PPG Indus., Inc.*, 118 F. App'x 366, 370 (10th Cir. 2004) (unpublished) (explaining that where the plaintiff had failed to show that management had any evidence, other than his own unsubstantiated allegations, that other employees had violated company policy, they were not similarly situated employees for purposes of inferring pretext). There also is nothing in the record that would allow a reasonable jury to find this conduct of comparable seriousness to Ms. Stephens' conduct.

Ms. Stephens asserts that Mr. Freeman requested a title on a car, and that he then purchased the car earlier than he should have been allowed to because it was on a stop sale list. Ms. Stephens, however, presents no evidence from which this Court, or a jury, could infer some wrongdoing with respect to this transaction. Indeed, Ms. Stephens admits that Mr. Freeman obtained the title with the permission of accounting management, and that he actually paid for the vehicle. No reasonable jury could find that this conduct was of comparable seriousness to Ms. Stephens' admission that she took a title from the accounting office and gave it to a third person to title it in both their names, thereby falsely representing to the State of Oklahoma that they owned a vehicle that had not been paid for at the time.

Finally, there are other undisputed material facts that show Ms. Hutton harbored no discriminatory animus toward Ms. Stephens based on her race or gender. For one, Ms. Stephens was paid more than any other controller at BMAG during both of her periods of employment. Ms. Hutton also awarded Ms. Stephens substantial, and larger, bonuses than other controllers. Ms. Hutton once paid Ms. Stephens a greater bonus than expected, and she told Ms. Stephens she deserved it. Further, Ms. Hutton placed Ms. Stephens in charge of training and, according to Ms. Stephens, was grooming Ms. Stephens for a promotion in mid-2018.

In summary, there is no evidence of record that BMAG's decision to terminate Ms. Stephens' employment was a mere pretext for discrimination or sufficient evidence to create a genuine factual dispute regarding pretext. Accordingly, BMAG is entitled to

summary judgment on Ms. Stephens' racially discriminatory wrongful termination claims under Title VII and under the OADA.

**B.      Ms. Stephens has abandoned her failure to promote claim; thus, BMAG is entitled to summary judgment on this claim.**

Although a failure to promote claim is not apparent on the face of the governing petition [*see* Doc. No. 1-1], BMAG also seeks summary judgment on such claim. Ms. Stephens makes conclusory allegations in her declaration and deposition testimony that Caucasian employees received promotions and she did not. However, she provides no evidence or discussion regarding this claim in her response brief. Thus, Ms. Stephens has abandoned her failure to promote claim. *See, e.g.*, *Maestas v. Segura*, 416 F.3d 1182, 1190 n.9 (10th Cir. 2005) (explaining that the plaintiffs have appeared to abandon "those claims as evidenced by their failure to seriously address them in their briefs"); *Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768–69 (10th Cir. 2001) (unpublished) (affirming the district court's decision to grant summary judgment for the defendants on the plaintiff's equal protection claim where the plaintiff failed to address the claim in his response to the defendants' motion for summary judgment).

Alternatively, Ms. Stephens admits that the only possible position that came open and to which she could have been promoted during her second term of employment was one in which she admits race and gender played no role in the decision. This was the finance director position, and Ms. Mirkhani, a Caucasian female, was promoted to that position. Ms. Stephens admits, however, that Ms. Mirkhani was qualified for the position.

Ms. Stephens also admits that Ms. Hutton was grooming her for a promotion in mid-2018, and BMAG was paying to send Ms. Stephens to leadership classes. However, the position never materialized before Ms. Stephens was terminated in August 2018. As such, Ms. Stephens presents no evidence that BMAG did not promote her on account of her race or gender, and BMAG is entitled to summary judgment on this claim.

**C.    BMAG is entitled to summary judgment on Ms. Stephens' wrongful termination claims based on gender discrimination under Title VII and under the OADA.**

Because she relies on circumstantial evidence, Ms. Stephens' gender discrimination claims under Title VII and the OADA, like her race discrimination claims, follow the three-step *McDonnell Douglas* burden-shifting analysis. Title VII prohibits an employer from discriminating against any individual "because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). The OADA makes it "a discriminatory practice for an employer . . . to discharge, or otherwise to discriminate against an individual . . . because of . . . sex." Okla. Stat. tit. 25, § 1302(A)(1). BMAG does not dispute Ms. Stephens' prima facie case of gender discrimination for purposes of the Motion. Moreover, as addressed above, the Court finds that BMAG has satisfied its "exceedingly light" burden of proffering a legitimate, non-discriminatory reason for Ms. Stephens' termination, i.e., the improper car deals and violations of company policy.

Ms. Stephens offers the same evidence in support of her claims of pretext on gender discrimination as she does with respect to race discrimination. Simply put, she offers no evidence of similarly situated male employees who violated work rules of comparable seriousness, nor does she show that similarly situated co-workers outside her

protected class were treated differently. Thus, BMAG is entitled to summary judgment on Ms. Stephens' gender discrimination claims under Title VII and the OADA.

**D.     BMAG is entitled to summary judgment on Ms. Stephens' retaliatory discharge claims under Title VII and the OADA.**

Because Ms. Stephens lacks direct evidence of discrimination or retaliation, the Court evaluates her retaliatory discharge claims under *McDonnell Douglas*. *See Rutledge v. Bd. of Cnty. Comm'rs of Johnson Cnty., Kan.*, No. 22-3081, 2023 WL 4618335, at *5 (10th Cir. July 19, 2023) (unpublished); *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 979 (10th Cir. 2008). To establish a prima facie case of retaliation, Ms. Stephens must show (1) she engaged in protected opposition to discrimination; (2) BMAG took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action. *See Fischer*, 525 F.3d at 979. BMAG asserts that Ms. Stephens cannot establish a prima facie case of retaliation because she did not engage in protected opposition.

Admittedly, Ms. Stephens never complained about race discrimination during her employment, nor did she directly complain about gender discrimination. Instead, she had "general conversations" with Ms. Hutton about male GMs "violat[ing] policies and not being held accountable" and how accounting people were "treated differently" than the GMs. [Doc. No. 53-2 at 46 (341:11–23)]. Although Ms. Stephens testified that she had these conversations with Ms. Hutton "all the time," she was unable to recall the specific dates, nor could she produce any notes or documents to show she complained about gender discrimination. *See id.* at 47–48 (342:23–343:13). Further, Ms. Stephens admits

30

that she never filed an actual complaint or went to Human Resources or even called the anonymous complaint hotline.

Ms. Stephens does not address her retaliation claim in her response brief other than to admit that she "did not report her concerns about discrimination and policy violations among employees." [Doc. No. 63 at 24]. "An employer's action against an employee cannot be because of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition." *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (emphasis omitted). That is, it is "crucial" that Ms. Stephens' employer "knew that she was engaging in protected opposition." *See id.* Other than general conversations with Ms. Hutton about male GMs violating policies, there is no evidence of record that BMAG ever knew that Ms. Stephens had complained.

Even if Ms. Stephens' general conversations with Ms. Hutton could be protected opposition, there is no evidence of a causal connection between the protected activity and Ms. Stephens' termination. At the time of her termination, Ms. Stephens was the highest paid controller, and Ms. Hutton, according to Ms. Stephens, had been grooming her for a promotion since mid-2018. Accordingly, BMAG is entitled to summary judgment on Ms. Stephens' retaliatory discharge claims.

## V.   <u>CONCLUSION</u>

For these reasons, the Court concludes that BMAG is entitled to summary judgment on Ms. Stephens' Title VII and OADA race and gender discrimination and retaliatory discharge claims. BMAG is also entitled to summary judgment on Ms. Stephens' race discrimination claim under 42 U.S.C. § 1981 for the same reasons her race

discrimination claim fails under Title VII. Additionally, BMAG is entitled to summary

judgment on Ms. Stephens' failure to promote claim. Consequently, the Court GRANTS

BMAG's Motion for Summary Judgment [Doc. No. 53], and this Order disposes of the

remaining claims in this action. A separate judgment will follow.[4]

      IT IS SO ORDERED this 28th day of August 2023.

_____
JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE

---

[4] In light of this Order, the Court terminates BMAG's Motion to Strike Witnesses
from Plaintiff's Witness List [Doc. No. 50] without a ruling.